## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK RUSSIN,<br>**Plaintiff** | : <br> : <br> : | No. 3:22cv872 |
| | : | (Judge Munley) |
| **v.** | : <br> : | |
| WAL-MART STORES EAST, LP d/b/a <br> WAL-MART DISTRIBUTION CENTER; <br> WAL-MART, INC. d/b/a WAL-MART <br> DISTRIBUTION CENTER; and <br> WAL-MART ASSOCIATES, INC., <br> **Defendants** | : <br> : <br> : <br> : <br> : <br> : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Mark Russin asserts claims against his former employer, Walmart, for sexual harassment, disability discrimination, hostile work environment, and retaliation pursuant to the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 43 PA. STAT. §§ 951, *et seq.* ("PHRA"). Before the court is a motion for summary judgment filed by Walmart as to each claim. (Doc. 38). Having been fully briefed, Walmart's motion is ripe for disposition.

## Background

Russin worked at a Walmart distribution center as a custodian. He received formal discipline and was ultimately terminated, per Walmart, for

working overtime and for working excessively long shifts without approval.

Russin maintains, however, that he had approval.  He asserts that Walmart fired

him because he rejected a sexual advance from the distribution center's general

manager and reported the incident.  Russin also asserts that Walmart terminated

him because he has actual or perceived disabilities related to the removal of his

esophagus and other related medical conditions.

The details of this case as presented, however, make the issues before the

court less straightforward on summary judgment. [1]  To start, Walmart hired

---

[1] Walmart filed a statement of material facts ("SOF") with the motion for summary judgment as required by the Rules of Court for the Middle District of Pennsylvania ("Local Rules"). M.D. PA. L.R. 56.1.  Russin responded as required by the Local Rules.  When possible, the court cites to Walmart's SOF, (Doc. 40), for facts which Russin admitted in his response, (see Doc. 43-1). Otherwise, the court cites to portions of the evidentiary record supplied by the parties.  All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

Russin, however, also filed an additional counterstatement of material facts, (Doc. 43-2). which Walmart moves to strike, (Doc. 48).  Local Rule 56.1 does not permit a non-moving party to file an additional statement of material facts that does not respond to the moving party's statement because such efforts hamper the court's ability to identify contested facts expeditiously. See Williams v. Pennsylvania State Univ., 697 F. Supp. 3d 297, 310–11 & nn. 29, 34 (M.D. Pa. 2023)(collecting cases).  When opposing a motion for summary judgment, it is sufficient for a non-moving party to deny paragraphs in a moving party's statement of material facts with citations to the record advancing that genuine issues remain for a factfinder. See FED. R. CIV. P. 56(c)(1), 56(e); M.D. PA. L.R. 56.1.  To the extent that there may be other evidence to consider, the non-moving party should tailor their responses to a moving party's statement of material facts without extraneous filings.

Nonetheless, Walmart's motion to strike and its request to respond to plaintiff's counterstatement of material facts will be denied.  The reasoned, appropriate approach under these circumstances is to consider the entirety of the parties' filings, including the additional facts advanced by Russin. See Williams, 697 F. Supp. 3d at 312; Evans v. Lowe's Home

2

Russin on January 30, 2020, to work at one of its distribution centers in Pottsville, Schuylkill County, Pennsylvania. (Doc. 40, SOF ¶ 5). Walmart initially hired Russin as a lift driver. (Doc. 43-12, Pl. Ex. J., Job Offer, Doc. 43-21). That job entailed moving pallets of product using a forklift-like machine in the meat and produce areas of the facility. (Doc. 43-4, Pl. Ex. B., Pl. Dep. 28:20–29:2, 48:19–24). Instead of being trained as a lift driver, however, Walmart tasked Russin with sweeping floors. (Id. 49:6–52:18).

Russin formally changed positions from lift driver to custodian on June 6, 2020. (Doc. 40, SOF ¶ 7). In that role, Russin's duties involved cleaning the workplace, including bathrooms and break areas. (Id. ¶ 8). Russin's tenure at the Walmart distribution center coincided with the first two years of the COVID-19 pandemic. (See Doc. 43-4, Pl. Dep., 56:4-18, 64:12-23; 81:21–82:11, 162:18-163:10, 165:4-11; see also Doc. 43-12, Pl. Ex. J., Job Offer, Doc. 43-21, Pl. Ex. S, Term. Form).

Distribution center operations involve order fulfillment and the outbound shipping of groceries to Walmart's retail stores. (See Doc. 43-15, Pl. Ex. M., C. Warner Dep., 13:4–12). Between 1,200-1,500 individuals worked in the building

---

Centers, Inc., No. 3:04cv0439, 2005 WL 2347246, at *4 (M.D. Pa. Sept. 26, 2005)(Munley, James, J.). The court will accept Russin's counterstatement only to the extent that the included facts are supported by the summary judgment record. Moreover, the evidentiary record provided by the parties is sufficient to address Walmart's motion for summary judgment.

at the time of the plaintiff's employment. (Doc. 43-10, Pl. Ex. H., J. Parrado Dep., 73:22–74:10; Doc. 43-33, Ex. EE, E. Hernandez Dep. 28:15–29:22).

Russin suffers from several medical conditions.  These conditions resulted in the removal of his esophagus prior to his employment with Walmart. (Doc. 43-4, Pl. Dep. at 14:11-15; Doc. 43-6, Pl. Ex. D., MGH Med. Recs, ECF p. 8). Russin, however, did not need an accommodation to perform the essential duties of lift driver or custodian at the distribution center.[2]  (Doc. 40, SOF ¶¶ 6, 8).

Per the plaintiff, however, the removal of his esophagus left highly visible scarring on his neck. (Doc. 43-4, Pl. Dep. 85:11-21, 87:2-15, 111:6–112:10, 264:24-265:1).  When asked about the scarring in the workplace, Russin told his Walmart coworkers and supervisors about his medical issues and the surgical intervention. (Id. at 87:2-15, 94:4–96:20).  Russin contends that his medical conditions were subsequently discussed by management. (Doc. 40, SOF ¶ 15). His actual medical conditions are disputed by the parties.  But, in his deposition, Russin explained that his Walmart supervisors construed his condition to be cancer based on workplace conversations. (Doc. 43-4, Pl. Dep., 87:2-20, 89:5-22, 94:3–96:19, 248:5-25, 251:5–252:9, 256:24-257:18, 266:3-16).

---

[2] Russin testified that he initially applied for work at Walmart's distribution center as an order filler. (Doc. 43-4, Pl. Dep. 219:1-221:18).  Walmart disqualified him from the position because he could not do sit-ups or lay flat on his back as the result of his surgeries. (Id.).  Ultimately, Walmart offered Russin the position as a lift driver. (Id., 221:19–222:25).

4

Russin also testified that he worked weekend shifts at the distribution center so he could attend medical appointments during the week. (Id., 22:21–23:7, 172:8–173:4).  Russin's schedule called for him to work Saturday, Sunday, and Monday from 5:00 AM to 5:00 PM. (Id., 229:3-14).  Nonetheless, at times, Russin worked more than fourteen (14) hours per shift. (Doc. 40, SOF ¶¶ 28, 34). Additional hours were not available in Russin's assigned department, but distribution center associates were permitted to work in other departments based on availability. (Doc. 40, SOF ¶¶ 23-24).

According to Russin, he regularly picked up additional hours in the meat and produce areas of the facility with the approval of those department managers. (Doc. 43-4, Pl. Dep., 139:19–140:20, 234:2–235:5).  According to Walmart, however, working more than fourteen (14) hours in a shift violated a safety rule set by the assistant general manager of the distribution center, Clinton Warner. (Doc. 43-15, C. Warner Dep. 18:1-20).

Russin contends that his issues at the workplace began in approximately April 2021. (Doc. 43-4, Pl. Dep., 246:16–247:5).  One day, the distribution center's general manager, Tim Dawson, called Russin into his office. (Id.) According to Russin, he recognized Dawson, but did not know his title or status. (Id. at 247:6-11).  Prior to that one-on-one meeting, Russin perceived Dawson as "some strange guy" and "a creep" who followed him around the workplace. (Id.)

5

According to the Russin's testimony about the meeting, the conversation concerned the plaintiff's use of overtime. (Id., 248:5–249:24). Dawson stated that Russin should not be working overtime with his condition. (Id.) Dawson also called the plaintiff "sickly." (Id., 175:16-19). During the meeting, Russin responded that he depended on the overtime. (Id., 248:5–249:24). Per the plaintiff, Dawson then stated (twice), "we have to go out if you want to change the outcome of your overtime." (Id.)

In that moment, Russin responded that he had work to do and left Dawson's office. (See id.,175:16–177:19; 184:14–185:1; 248:5-249:24). According to Russin, he thought Dawson was hitting on him and, in context, interpreted the comments as sexual in nature. (Id.) According to the plaintiff, Dawson "didn't seem too very happy" and "was kind of angry" after being rebuffed. (Id., 175:16–176:22).

As discussed in this memorandum, Russin reported to many different individuals during his time at the Walmart distribution center. For the relevant period, Russin's direct supervisor was Joseph Cookson, a maintenance area manager. (Doc. 40, SOF ¶ 10). Cookson's supervisor was Joseph Parrado, maintenance operations manager. (Id. ¶ 11). Cookson and Parrado were supervised by Clinton Warner, the assistant general manager. (Doc. 40, SOF ¶ 12). Warner reported to Dawson, the general manager of the entire facility. (See

Doc. 43-15, C. Warner Dep., 11:12-18).  Following Russin's one-on-one meeting

with Dawson, the plaintiff reported seeing Dawson approach Parrado, plaintiff's

second-level supervisor. (Doc. 43-4, Pl. Dep., 66:23–67:13, 176:17-22; 249:25–

251:4; Doc. 43-17, Pl. Ex. O, S. Schmidt Investigative Report, ECF p. 8).

After Dawson spoke to Parrado, Parrado then told Russin that he could no

longer accumulate overtime. (Doc. 43-4, Pl. Dep., 178:14-25; Doc. 43-17, Pl. Ex.

O, S. Schmidt Investigative Report, ECF p. 8).  In that conversation, Parrado also

referenced the plaintiff's scar and mentioned cancer. (Doc. 43-3, Pl. Dep., 85:8–

86:20).  Russin believed that Parrado's conduct came at the direction of Dawson.

(Id., 67:21–68:5).  Nonetheless, Russin testified that he still observed people at

the distribution center working overtime, including sixteen-hour shifts or more.

(Id. 68:6–73:23).

After the meeting with Dawson, Russin alleges that his Walmart

supervisors fixated on his use of overtime hours versus other workers.  Relevant

to the plaintiff's adverse work events in this case, Walmart maintains a four-step

discipline policy. (Doc. 40, SOF ¶ 4; see also Doc. 41-2, C. Warner Dep., 42:14-

19).  On May 15, 2021, Walmart issued Russin a Step 3-level disciplinary action,

skipping two levels under the policy. (Doc. 40, SOF ¶ 29).  Per Walmart,

supervisors disciplined Russin for working overtime and working more than

fourteen hours without approval. (Doc. 43-20, Pl. Ex. R., Step 3 Incident Report).

7

According to the documentation, Russin had been instructed by the operations manager (Parrado) and the assistant general manager (Warner) not to do so. (Id.)

After the meeting with Dawson, Russin alleges that his Walmart supervisors also fixated on his scar and his health conditions. He asserts that Parrado and Cookson made him get a COVID-19 vaccination unlike other workers, who were not obligated to get one. (Doc. 43-4, Pl. Dep. 64:12-23, 255:25–257:18)  Russin also noticed that he no longer had access to gloves to use when he cleaned the distribution center. (Id., 64:12-23, 66:12–67:13).  But, per Russin, two other workers in the department had access to gloves. (Id., 83:7-19).

Then, on October 17, 2021, Walmart terminated the plaintiff. (Doc. 43-21, Term. Form).  In a corresponding incident report dated the next day, Walmart documented that it fired Russin because he worked "unauthorized, excessively long days (greater than 14 hrs)." (Doc. 43-24, Step 4 Incident Report).  Walmart cited Russin's "continued insubordination and failure to follow management guidance" regarding lengthy shifts and overtime and reasons for his termination. (Id.)  Walmart's termination document also referenced Russin's prior discipline regarding working "unapproved overtime and unapproved, excessively long work days that exceeded 14 hrs." (Id.)

Russin maintains that he followed facility overtime policies and received approval to work in different departments. (Id., 134:15–137:23, 154:13–159:25). He also contends that other workers did not experience the same treatment that he received, particularly after his one-on-one meeting with Dawson.

For additional context, Walmart maintains a corporate ethics and compliance department, referred to in this case as "Global Ethics." Before termination, Russin anonymously reported the incident with Dawson to that department. (Id., 126:1-24). He also told a coworker and other Walmart employees with supervisory or managerial authority. (Id., 123:15–130:25). After termination, Russin again reported the incident with Dawson along with the health-related hostilities he experienced in the workplace, including the vaccination mandate and lack of access to gloves. (See Doc. 43-17, Pl. Ex. O, S. Schmidt Investigative Report). Walmart's Global Ethics department conducted interviews following Russin's termination. (Id.) Walmart's investigation of itself concluded that Russin's allegations were unsubstantiated. (See Doc. 43-19, Pl. Ex. Q, C. Koutsombinas Email 01/07/2022). On the other hand, Walmart's investigation also concluded that "facility management did not take ownership for reporting the allegations that were reported to them," relative to Russin's pre-termination reporting. (Id.)

Based on the above events, Russin's amended complaint maintains several causes of action. Count I asserts that Walmart is liable under the ADA for disability discrimination, hostile work environment, and retaliation. Count II advances claims for sexual harassment, hostile work environment, and retaliation pursuant to Title VII. Count III and Count IV mirror the above claims and allege that Walmart violated the PHRA.

At the close of discovery, Walmart filed the instant motion for summary judgment on each of the plaintiff's claims. (Doc. 38). In his brief in opposition, Russin indicates that he is abandoning his claims for hostile work environment. (See Doc. 43 at 1, n. 1). While not as clearly indicated, Russin also does not contest Walmart's motion for summary judgment on his ADA retaliation claim and its PHRA counterpart. Thus, summary judgment will be granted in favor of Walmart on these claims without additional discussion. That leaves Russin's sexual harassment, disability discrimination, and Title VII/PHRA retaliation claims remaining for disposition.

**Jurisdiction**

Because this case is brought pursuant to the ADA and Title VII, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over

plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

**Standard of Review**

Walmart has filed a motion for summary judgment seeking dismissal of this action with prejudice.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>,

477 U.S. at 248.  A fact is material when it might affect the outcome of the suit

under the governing law. <u>Id.</u>  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the non-movant's burden of proof at trial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party

satisfies its burden, the burden shifts to the nonmoving party, who must go

beyond its pleadings, and designate specific facts by the use of affidavits,

depositions, admissions, or answers to interrogatories showing that there is a

genuine issue for trial. <u>Id.</u> at 324.

"In employment discrimination cases, the summary judgment standard 'is

applied with added rigor' because 'intent and credibility are crucial issues.' "

<u>Walden v. Saint Gobain Corp.</u>, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004)(quoting

<u>Stewart v. Rutgers, The State Univ.</u>, 120 F.3d 426, 431 (3d Cir. 1997)).

Moreover:

> Employment discrimination cases center around a single
> question: why did the employer take an adverse
> employment action against plaintiff? Because this is clearly
> a factual question, summary judgment is in fact rarely
> appropriate in this type of case. Simply by pointing to
> evidence which calls into question the defendant's intent,

12

> the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.

Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 509–10 (3d Cir. 1996)(internal quotation marks, citation, and explanatory parentheticals omitted).

## Analysis

Walmart's summary judgment motion targets Russin's claims for sexual harassment, disability discrimination, and retaliation asserted pursuant to federal and state law.[3] Because Russin claims that his workplace problems began after his meeting with Dawson, the distribution center's general manager, the court will first consider the evidence relative to Russin's sexual harassment claims.

### 1. Sexual Harassment

Russin's Title VII/PHRA sexual harassment claims are premised on a single interaction with the distribution center's general manager, Tim Dawson, during a one-on-one meeting. Per Russin, Dawson requested to meet the plaintiff after work to "change the outcome" of the decision to cut plaintiff's overtime. (Doc. 43-4, Pl. Dep., 248:5-249:24). Russin interpreted Dawson's statements as a sexual advance. Subsequently, Russin experienced formal discipline and Walmart fired him several months later. Russin claims that these

---

[3] Russin's state law PHRA claims will be interpreted coextensively with his ADA and Title VII claims. See Morgan v. Allison Crane & Rigging LLC, 114 F.4th 214, 220, n. 21 (3d Cir. 2024)("federal courts should continue to interpret the PHRA in harmony with the ADA."); Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083–84 (3d Cir. 1995) (noting that the PHRA is "construed consistently with interpretations of Title VII.").

adverse work events were the result of rejecting Dawson's advances. In moving for summary judgment, Walmart argues that, even assuming Russin's version of events to be true, Dawson's request to discuss overtime with the plaintiff after work occurred in an objectively non-sexual manner. (See Doc. 39, Def. Br. in Supp. at 1, 12, 16).

The legal framework of Title VII makes it unlawful to "discriminate against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's…sex." 42 U.S.C. § 2000e-2(a). "As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them." Bostock v. Clayton Cnty., Ga., 590 U.S. 644 at 670. "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he…establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753–54 (1998). Specifically:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute *quid pro quo* sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

14

Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist., 971 F.3d 416, 427 (3d Cir. 2020)(quoting Bonenberger v. Plymouth Tp., 132 F.3d 20, 27 (3d Cir. 1997); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997), abrogated on unrelated grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006))(brackets omitted).

However, "plaintiffs in a Title VII action must…always 'prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex.' " Doe by & through Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 534 (3d Cir. 2018)(quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).  The inquiry in sexual harassment cases also "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale, 523 U.S. 75, 81 (1998)).

Upon careful consideration of the record and the context described by Russin, the plaintiff can only demonstrate that Dawson's statements to meet outside the workplace were unwelcome, not that they were sexual in any regard.

According to the plaintiff, Dawson stated, "we know you're sickly[,]" which was accompanied by a statement of, "we're going to have to cut your overtime," and then, "we can discuss this outside the place. So we can see if we can change the outcome." (Id., 175:16–176:22).  Per Russin's testimony, Dawson prefaced his allegedly sexual advance with a statement referencing the plaintiff's poor health.  Nothing in the prefacing statements attributed to Dawson by the

plaintiff references sex or a romantic interaction or is even complimentary in any way.

Russin also testified:

> He said basically we can go out, and he said, and we can discuss[] this, he says, out here. We can see if we can change the outcome. That's basically what he said. And I was like -- I laughed it off. I didn't think anything of it at first. I thought he was joking. Because I don't know him, I thought it was a joke. You know, it's not like a buddy asking you to go have a beer that you know. I just met that guy. I know nothing about this guy.
>
> Then he said to me again, he goes, if you want to change the outcome, he said, we have to go out if you want change the outcome of your overtime. And right then I was, like -- and he looked at me and as a man you know when you're hitting on a woman, a woman's hitting on you. You know, it's just very uncomfortable and then he got mad.

(Id., 249:3-21).

Thus, according to Russin's testimony, he interpreted Dawson's request as a sexual advance because of eye contact and body language. Russin described it as a look that made the plaintiff uncomfortable and caused him to abruptly end the conversation. (Id., 248:5–249:24). But Russin's testimony about that look is incongruent with a sexual advance:

> Q.    Why did you interpret that statement to be sexual?
>
> A.    You know when -- because of the way he looked at me and the way he said it. I mean, you can see when somebody says something angry and condescending and the way he looked at me – and

16

> the way he was looking at me.  It was just strange.  It
> was creepy to be honest with you, the way he said it.
>
> Why would I have to meet anybody after work to
> discuss overtime anyway?  I didn't know that was a
> requirement of Walmart to discuss some things
> outside of work.  Why would I have to go somewhere
> personal with the man?

(Id., 248:5–249:24).

In light of the above testimony, no reasonable trier of fact could infer a sexual advance from an angry look or a condescending look along with the statements allegedly attributable to Dawson during this single meeting.

Russin has thus failed to respond to Walmart's summary judgment motion with evidence demonstrating a genuine issue of material fact.   Per Russin, he had no other interactions with his general manager in the six months between this meeting and the plaintiff's termination. (Doc. 43-4, Pl. Dep. 255:10-24). Consequently, Russin has no other evidence whatsoever regarding his interactions with Dawson taking on any sexual connotations.  There are no other statements, gestures, or physical contact that would suggest that Dawson had a sexual interest in the plaintiff.  Russin only has his subjective perceptions and conclusions about a single meeting that, as described by the plaintiff, lacked other details or context connecting the conversation to the plaintiff's sex. Speculation that his supervisor "might have had a sexual interest" is insufficient to defeat summary judgment. See Toth v. California Univ. of Pennsylvania, 844

F. Supp. 2d 611, 630 (W.D. Pa. 2012)(citation omitted).  Thus, summary judgment will be granted in favor of Walmart on the plaintiff's Title VII/PHRA sexual harassment claims.

## 2. Disability Discrimination

Walmart also moves for summary judgment on Russin's ADA and PHRA disability discrimination claims.  The ADA makes it unlawful for a covered entity to "discriminate against a qualified individual on the basis of disability in regard to…discharge of employees…and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

In the absence of direct evidence of discriminatory treatment, the court uses the three-part framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to evaluate the evidence relative to Russin's claims.[4]  See Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999).

---

[4] In countering summary judgment, Russin contends that he has direct evidence of discrimination.  Direct evidence is evidence, which, if believed, would prove the existence of the fact in issue without inference or presumption. Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994)(citations omitted).  The evidence must demonstrate that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision. See Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269 (3d Cir. 2010)(citing Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997); Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)(quotation marks omitted).   Direct evidence must be "strong enough" for a factfinder to infer an employer's discriminatory attitude and must be connected to the challenged employment decision. Id. (citation omitted).  Additionally, "any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision." Id. (citation omitted).  These requirements create a "high hurdle" for plaintiffs. Id.  In this case, there is no testimony from a decision-maker or documentary evidence directly stating that Russin was disciplined at

Under the law, Russin must first demonstrate a *prima facie* case of discriminatory treatment, that is: (1) he has a disability within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he suffered an otherwise adverse employment decision as a result of discrimination. See Morgan, 114 F.4th at 221 & n. 23 (citing Eshleman v. Patrick Indus., Inc., 961 F.3d 242, 245 (3d Cir. 2020); Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999)) (quotation marks and bracketing omitted).  A *prima facie* case simply means that the plaintiff presents "a claim that on first sight has enough merit to proceed." Fowler v. AT&T, Inc., 19 F.4th 292, 298–99 (3d Cir. 2021) (citing Walton, 168 F.3d at 668).

In its motion for summary judgment, Walmart directly challenges the third element, that is, whether Russin suffered adverse employment actions because of a disability. (Doc. 39, Def. Br. in Supp at 5-6).  Before addressing that element of the plaintiff's *prima facie* case, however, the court must address whether Russin has a disability within the meaning of the ADA because Walmart does not outright concede that issue in its moving papers.  Instead, in phrasing its

---

work or fired because he has a disability. Rather, Russin's disability discrimination case relies upon evidence requiring inferences of discrimination. The court will thus apply the McDonnell Douglas burden-shifting framework.

arguments, Walmart seeks to restrict Russin's ADA and PHRA claims solely to disabilities related to the removal of his esophagus. (See Doc. 39, Br. in Supp. at 5).  Moreover, Walmart also challenges whether Russin's amended complaint sufficiently placed them on notice of a "regarded as" disability claim. (Doc. 39, Br. in Supp. at 5, n. 2).  Russin's amended complaint, however, asserts "actual/perceived/record of" ADA claims. (Doc. 20, Am. Compl, Count I, ¶ 56). Russin thus counters that he qualifies for protected status under the different manners the term "disability" is defined by the ADA, including the definitions related to a "regarded as" disability claim.  (Doc. 43, Pl. Br. in Opp at 10-13).

Relevant to resolving the issues raised in Walmart's motion, the definition of "disability…shall be construed…in favor of broad coverage of individuals…to the maximum extent permitted" by the terms of the ADA. 42 U.S.C. § 12102(4)(A).  A plaintiff has a "disability" as defined by ADA "if they: (1) have 'a physical or mental impairment that substantially limits one or more' of their 'major life activities'; (2) have 'a record of such an impairment'; or (3) are 'regarded as having such an impairment.' " Morgan, 114 F.4th at 221 (quoting 42 U.S.C. § 12102(1)).  By law, major life activities include "performing manual tasks…and working." 42 U.S.C. § 12102(2)(A).  "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the

immune system," as well as digestive and bowel functions. 42 U.S.C. § 12102(2)(B).

As defined:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.*

42 U.S.C. § 12102(3)(A)(emphasis added).

Consequently, by the terms of the statute, " 'the requirements for a prima facie 'regarded as' claim are less demanding' than those for an actual disability claim." Morgan, 114 F.4th at 224 (quoting Mancini v. City of Providence by & through Lombardi, 909 F.3d 32, 46 (1st Cir. 2018)).

Here, Russin has responded to the motion for summary judgment with evidence demonstrating a genuine issue of material fact as to whether he meets the definitional requirements for a "regarded as" disability claim through reference to his deposition testimony and that of his former Walmart supervisors. Russin's supervisors, including Dawson, were under the impression that he had cancer or was a cancer survivor. (Doc. 43-10, J. Parrado Dep. 20:22–21:5; Doc. 43-14, R. Williams Dep. 21:3-7; Doc. 43-16, T. Dawson Dep. 48:10-21). Others like Warner, the assistant general manager, testified that they were aware that

Russin sought overtime to pay for "bills...associated with either medical care or medicine." (Doc. 43-15, C. Warner Dep. 24:18–25:1).

According to Russin, his esophagectomy scarring was also a topic of frequent reference in the workplace and was brought up immediately by his supervisors after the encounter with Dawson.  (Doc. 43-4, Pl. Dep. 85:8–88:2). He testified that Dawson called him "sickly" during that meeting. (Id., 175:16-19). Dawson then wanted a "write-up" about the plaintiff's scar. (Id., 117:12-118:4).

Russin also testified that his supervisors singled him out regarding COVID-19 vaccination.  He detailed how supervisors addressed his health differently than other employees, particularly upon his return from COVID-related leaves of absence. (Id., 165:12–170:5).  Per his testimony, Russin missed work due to COVID-19 policies in the workplace. (Id., 163:11–165:11).  Russin took or was required to take as many as five (5) COVID-19 leaves of absence during his employment.[5] (Id., 162:18–165:3).  Russin contends that he received disparate treatment relative to his real or perceived conditions and COVID-19, particularly from Cookson and Parrado, his supervisors. (Id., 167:1–170:5).  Per Russin's deposition testimony, Parrado told him, at one point, "you need to get the COVID

---

[5] Parrado, the maintenance operations manager, testified that Russin's COVID-19 leaves of absence spanned two weeks each time. (Doc. 43-10, Pl. Ex. H., J. Parrado Dep., 28:22–29:2).

shot…because you more than anybody needs to get it."[6] (Id., 89:5-22).  Parrado then allegedly told Russin that he "can't be in here with COVID around" and that the plaintiff had to get the vaccine, or he would not have a job at the distribution center. (See id. 89:5-22, 256:24–257:18).

In their depositions, these supervisors denied treating Russin differently. Parrado testified that he did not instruct Russin to get a COVID-19 vaccine. (Doc. 43-10, Ex. H., J. Parrado Dep. 29:3-6).  Rather, per Parrado, it was the plaintiff's idea to obtain that vaccination. (Id.)  Parrado also testified that Cookson, the plaintiff's direct supervisor, was present for that conversation. (Id. 29:7-21).

Walmart's post-termination investigation into Russin's complaints included interviews with Cookson and Parrado. (Doc. 43-17, ECF p. 12).  The Walmart-employed investigator reported that Parrado "spoke with Russin when Russin returned from a Covid-19 [leave of absence] and asked Russin what [he] planned to do differently in the future to prevent another" COVID-related leave. (Id.)  Cookson recalled that meeting conversation differently. (Id.)  Per the Walmart investigator, Cookson relayed that he and Parrado asked the plaintiff if there was anything they could do to help. (Id.)  For his part, Russin testified that he obtained a COVID-19 vaccine to pacify his supervisors and that he did not have

---

[6] According to Russin, Parrado also told the plaintiff that he could not work overtime "due to [his] condition." (Doc. 43-4, Pl. Dep., 251:14–252:9).  When plaintiff then brought up others being able to work overtime, Parrado allegedly told the plaintiff to go clean bathrooms. (Id.).

a choice if he wanted to keep his job. (Doc. 43-4, Pl. Dep., 258:12-20).  Thus, considering the existence of Russin's neck scarring, his perceived medical conditions, and the presence of COVID-19 in this workplace, there are conflicts in the evidence as to whether the plaintiff was regarded as having physical impairments related to his major bodily functions, including the functions of his immune system.

The above discussion blends into Walmart's core argument against Russin's *prima facie* case, that is, Walmart contends that Russin did not suffer adverse employment actions because of his disabilities.  The record, however, reflects genuine issues of material fact.  As a prime example, Russin's COVID-related leaves of absence worked their way into internal discussions of his termination.  The summary judgment record contains messages between Cookson (plaintiff's direct supervisor) and Warner (the assistant general manager) dated October 18, 2021, one day after Walmart fired the plaintiff. (Doc. 43-22, Pl. Ex. T, ECF p. 5).  The following exchange occurred:

> Cookson:  When I walked Mr. Russin out yesterday he told me he was going to call home office and his lawyer, and he hopes we have good lawyers.
>
> Warner:  nice.  what did we finally term him for?
>
> Cookson:  They [*sic*] last two weeks that he worked before his 12th covid leave he worked over 14 hours 5 out of the 6 days

> Warner:     after being told not to do it on multiple
>             occasions.  how did you write it up in his ptl?[7]
>
> Cookson:    I have documentation of all his punches if the
>             need arises
>
> Warner:     yep, make sure you have everything
>             documented and it is written up clearly in his
>             PTL for the step 4.
>
> Cookson:    Associate had various days from 9/18, 9/19,
>             9/20, 9/25, 9/27 over 14 Hours.  Associate
>             was previously addressed of same nature with
>             Step 3
>
> Warner:     I would write more and make it very clear what
>             he did.  I can help you if you need it.

(Id.)(formatting modified)(all capitalization and punctuation errors included).

In these messages, Cookson referred to Russin's "12th covid leave" occurring just prior to his termination.  Coupled with Russin's testimony about his medical conditions and his treatment from supervisors based on their beliefs about his conditions, the plaintiff has responded to the motion for summary judgment with sufficient evidence that can be used by a jury to connect his firing to disability discrimination.

---

[7] PTL refers to for Walmart's performance tracking log system. (See Doc. 43-15, C. Warner Dep. 63:19-23).  A Walmart employee tasked with reviewing Russin's internal complaint ultimately found it "out of the ordinary" how the plaintiff's disciplinary actions were documented in the defendants' system. (Doc. 43-25, D. Pohren Email 11/11/2021, ECF p. 2).

At the second stage of the McDonnell Douglas framework, the burden of production shifts to Walmart to articulate legitimate, non-discriminatory reasons for its actions. See Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 (1981). Here, Walmart documented that it fired Russin because he worked "unauthorized, excessively long days (greater than 14 hrs)." (Doc. 43-24, Wal-Mart, Step 4 Incident Report). Additionally, Walmart cited Russin's "continued insubordination and failure to follow management guidance" regarding overtime and lengthy shifts as reasons for his termination. (Id.) Walmart's termination document also referenced Russin's prior discipline regarding working "unapproved overtime and unapproved, excessively long work days that exceeded 14 hrs." (Id.) Walmart has thus met their burden here.

To defeat summary judgment at the third McDonnell Douglas step, Russin must then demonstrate that the proffered reasons were not the true reasons for the employment decision, i.e., that the reasons were pretext for intentional discrimination. Burdine, 450 U.S. at 255. "To establish pretext, 'a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.' " Qin v. Vertex, Inc.,

100 F.4th 458, 474–75 (3d Cir. 2024)(quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

As for a jury believing that disability discrimination was the reason for Russin's discipline and termination, the court considers "the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 347 (3d Cir. 2022). This may include evidence that "the employer treated other, similarly situated persons not of his protected class more favorably[.]" Fuentes, 32 F.3d at 765. The circumstances may also include "antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and *any other evidence* suggesting that the employer had a [discriminatory] animus when taking the adverse action." See Canada, 49 F.4th at 347 & n. 44 (emphasis added)(quoting Daniels, 776 F.3d at 196)(further citations omitted). Evidence supporting the plaintiff's *prima facie* case can also be considered. Id. (citing Farrell, 206 F.3d at 286; Jalil v. Avdel Corp., 873 F.2d 701, 709, n. 6 (3d Cir. 1989)).

To check these boxes, Russin counters Walmart's arguments with a broad array of evidence that a jury may use to find pretext for discrimination. [8] The

---

[8] Russin asserts that four other distribution center employees regularly worked in excess of fourteen hours and were not disciplined. Walmart, however, rigorously disputes whether these

court need not reiterate all the evidence discussed above regarding plaintiff's

*prima facie* case.  But a reasonable, rational jury may conclude from the

messages exchanged by Cookson and Warner that Russin's actual or perceived

disabilities were the motivating or determinative causes of Walmart's decision to

terminate the plaintiff.  These messages cut both ways in this case.  While

Warner's "what did we finally term him for?" could be read to suggest that Russin

was frequently insubordinate regarding overtime or long shifts, a jury could also

consider that evidence as proof Walmart supervisors had been engineering legal

shelter to terminate Russin for his disabilities, real or perceived, particularly

considering Cookson's reference to his "12th covid leave."

---

individuals are appropriate comparators to show pretext.  Under the law, "[c]omparator employees need not be identical but must be similarly situated in 'all material respects.' " Qin, 100 F.4th at 474 (citing In re Tribune Media Co., 902 F.3d 384, 403 (3d Cir. 2018))(further citations omitted).  "Factors that are relevant include whether the employees dealt with the same supervisor, were subject to the same standards, and shared similar job responsibilities." Id. (citations omitted).  "An employee who holds a different job title or works in a different department is not similarly situated." Id. (citing Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013)).

Here, Russin has not demonstrated that these other workers were similarly situated.  While they may have been working under the same general manager and assistant general manager, there is no evidence that they dealt with the same area or department managers, that is, Cookson and Parrado.  Russin himself testified that the other workers were employed in different departments. (Doc. 43-3, Pl. Dep. 68:6-69:10).  And the records he provided to oppose summary judgment indicate that none of these individuals were custodians.  Rather, these employees held job titles like "Area Manager-Floor (Grocery)," "G_Unloader/Processor," "AssetPrtctnAsscte-AllDC/FC," and "Groc Lift Driver-Meat&Produce" (Docs. 43-26 to 43-29). Based on Third Circuit precedent, the court cannot consider this comparator evidence.

Warner, the assistant general manager, also testified that he never met Russin personally. (Doc. 43-15. C. Warner Dep. 17:5-10). A jury may take the messages and Warner's testimony and conclude that Russin's insubordination over work hours was a legitimate reason for termination. Or they may approach these facts with skepticism as to why Warner would critique the notations in plaintiff's personnel record and offer to help a maintenance area manager draft something more sufficient.[9]

Russin has marshalled other evidence that a reasonable jury could use to reject Walmart's reasoning for his termination. Prior to Parrado's tenure as the distribution center's maintenance operations manager, Russin was supervised by Robert Williams in that role until December 2020. (Doc. 43-14, 13:5-21, 45:8-19, 48:6-8). Williams recalled that Russin worked overtime in different departments with his approval or approval of the appropriate area manager. (Id. 22:24–23:22). Williams testified that had no issues with Russin's performance and did not recall

---

[9] Russin also cites to inconsistencies in the oral and written reasons Walmart provided for his firing. Per documents attached to oppose summary judgment, Walmart gave the Pennsylvania Department of Labor a slightly different reason for Russin's termination. According to this record, Walmart indicated that the "[a]ssociate worked overtime without proper approval." (Doc. 43-32). There is no reference to working over fourteen (14) hours or insubordination in this form provided to the Commonwealth as part of an unemployment compensation matter. Russin also testified that he was verbally told he was terminated due to working overtime with no reference to working more than fourteen hours. (Doc. 43-4, Pl. Dep. 154:13–159:20). Additionally, one of Russin's co-workers testified that, when overtime was available, employees of the distribution center could work sixteen (16) hours in one shift. (Doc. 43-13, Pl. Ex. K., S. Shay Dep. 15:22–16:11).

any specific instances where he or others had to counsel the plaintiff for improper use of overtime. (Id. 13:5–14:2, 16:3-7, 17:16–18:3, 20:13:17, 49:10-21).

But under the supervision of Parrado and after the encounter with Dawson, the tenor of the workplace changed, per the plaintiff.  Russin testified that Dawson and Parrado were very close. (Doc. 43-4, Pl. Dep. 120:4-25).  After his meeting with Dawson in April 2021, Russin reported seeing Dawson approach Parrado. (Doc. 43-4, Pl. Dep., 66:23–67:13, 176:17-22; 249:25–251:4).  Russin testified that his health then became a matter of concern to his supervisors. (Id. 85:3–86:1). Parrado asked Russin about the scar on his neck. (Id.)  Parrado also then told Russin that he could no longer accumulate overtime due to his condition. (Doc. 43-4, Pl. Dep. 249:25–252:9 (reviewing Doc. 43-17, S. Schmidt Investigative Report, at ECF p. 8)).  Russin believed that Parrado's directives came from Dawson and that the same directives were applied by the plaintiff's first-line supervisor, Cookson. (Doc. 43-4, Pl. Dep., 107:22–110:7).

Prior to his termination, Russin received formal discipline for working overtime and working more than fourteen hours in one shift without approval. (Doc. 43-20, Step 3 Incident Report).  This earlier discipline is referenced in his termination documents. (Doc. 43-24, Step 4 Incident Report).    In all instances, Russin recalled asking if overtime was available and receiving approval from

managers in other departments to work additional hours in those areas of the facility. (Doc. 43-4, Pl. Dep. 132:17–139:13, 155:11–159:20).

Russin also described working approved overtime outside of his department with other individuals until "every truck was out." (Id. 68:9-16, 70:2–71:20). Otherwise, per the plaintiff, there would be no product in Walmart's retail stores. (Id., 158:22–20). He also illustrated the "revolving door" of employees in different departments that could not handle the work. (Id., 136:13—137:23). Russin further described a frequent "jockeying around" of supervisors with at least two of his managers being terminated during his tenure. (Id., 65:14–66:7, 106:25–107:10, 227:14–228:4). He referred to COVID-19 as creating "a crazy situation" in the workplace. (Id. 83:7–84:6). Similarly, a distribution center manager recalled the personnel and supply-chain issues created by the pandemic. (Doc. 43-33, E. Hernandez Dep., 28:15–29:22). And prior to being escorted off the premises, Russin questioned Cookson regarding what he believed to be a paradox in his situation. (Doc. 43-4, Pl. Dep., 244:6–245:13). Per Russin, he told Cookson that the distribution center was "crying, asking people for overtime. You have such turnaround. But the other departments, they're asking me to work." (Id.) Consequently, upon consideration of all the evidence discussed in this memorandum, a jury could disbelieve that Walmart fired the plaintiff for working too many hours in a retail distribution center during

the COVID-19 pandemic.  Walmart's motion for summary judgment on the plaintiff's disability discrimination claims will thus be denied.

### 3. Retaliation

The last matter to address relates to Russin's retaliation claims, which he asserts pursuant to the ADA, Title VII, and PHRA. (See Doc. 20, Am. Compl., Counts I-IV).  As noted above, Russin did not counter Walmart's arguments regarding disability-related retaliation.  Rather, plaintiff makes clear in his brief in opposition that he "pursues his retaliation claims based upon his protestations to management regarding [Dawson's] sexual advance toward him[.]" (Doc. 43, Pl. Br. in Opp. at 24).  Accordingly, Walmart's motion for summary judgment will be granted as to the disability-related retaliation claims in Count I (ADA) and Count III (PHRA).

As for Russin's remaining retaliation claims premised upon Title VII and the PHRA, those claims are also analyzed through the McDonnell Douglas framework where the plaintiff relies upon circumstantial evidence. See Canada, 49 F.4th at 346 (citing Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006)). To establish a *prima facie* case for retaliation, the plaintiff must demonstrate "(1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists

between the protected activity and the adverse action." Qin, 100 F.4th at 476 (quoting Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995)).

For summary judgment purposes, Walmart concedes the first two elements of plaintiff's *prima facie* case, but challenges whether Russin can show causation. Since the court has already concluded that Walmart has met its burden to show legitimate, non-discriminatory reasons under the second stage of McDonnell Douglas, Russin must also demonstrate that those reasons are pretext for retaliation. Accordingly, Russin is obligated to "establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the McDonnell Douglas framework to satisfy [his] ultimate burden of persuasion by proving pretext." Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257 (3d Cir. 2017). Under the law, "[t]he plaintiff…cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." Daniels, 776 F.3d at 196 (citations omitted).

In challenging causation, Walmart argues that Cookson and Parrado (plaintiff's lower-level supervisors) made the decision to terminate Russin, not Dawson (the facility general manager). Walmart has also supplied declarations indicating that Cookson and Parrado were not aware of Russin's reports about

Dawson until after the plaintiff's termination. (Doc. 39, Def. Br. in Supp. at 20; see also Doc. 41-9, Def. Ex. I, J. Cookson Decl. ¶¶ 5-8; Doc. 41-10, Def. Ex. K, J. Parrado Decl. ¶¶ 6-9; Doc. 41-11, T. Dawson Decl. ¶ 6).

Russin counters that there is evidence of record demonstrating that Cookson and Parrado knew about the plaintiff's reporting of the incident with Dawson, citing his own testimony and information contained in Walmart's post-termination investigative report. (Doc. 43, Pl. Br. in Opp. at 24). Walmart counters that the plaintiff's citations to the evidence are mischaracterized. (Doc. 51, Def. Reply Br. at 12-15). After a careful review of the record on causation, summary judgment on Russin's Title VII/PHRA retaliation claim will be granted.

First, there is no evidence that Russin's anonymous complaint about Dawson to Walmart's Global Ethics department was actually investigated. Russin testified that he reported the incident and never heard back from Walmart corporate. (Doc. 43-4, Pl. Dep. 126:1:14). Walmart takes the position that it could not find a "recorded ticket from Russin or any anonymous reporter regarding a similar concern against Dawson." (Doc. 43-17, Pl. Ex. O, S. Schmidt Investigative Report, ECF p. 14).

As for reporting the matter to other Walmart employees and supervisors, Russin testified that he told: 1) Sebastian Shay, a co-worker; 2) Robert Williams, the plaintiff's former second-level supervisor who had moved on to a different

Walmart distribution center; 3) Elsa Hernandez, the distribution center's

Environmental, Health, and Safety manager; and 4) another manager that did not

want to be involved. (Doc. 43-4, Pl. Dep. 123:5–124:15).  Russin could not recall

if he told anyone else. (Id., 124:16-21).  When Walmart investigated the incident

post-termination, Russin reported that he told Shay, Williams, and Carl McGinley,

a grocery area manager, about the incident. (Doc. 43-17, S. Schmidt

Investigative Report, ECF p. 3).  But there is no evidence of record that Shay,

Williams, Hernandez, or McGinley then told Cookson, Parrado, or even Dawson

about Russin's sexual harassment complaint.

Russin cites to his own deposition testimony for the proposition that he

specifically told Parrado, his second-level manager, about what happened with

Dawson. (Doc. 43, Pl. Br. in Opp. at 24; Doc. 43-2, Pl. Counterstatement of

Material Facts ¶ 39).  This argument is not supported by the record, however.

In opposition to Walmart's motion, Russin cites to the following testimony:

> Q.    Do you believe that Mr. Parrado was discriminating
>        against you because Mr. Dawson told him to?
>
> A.    I believe that.
>
> Q.    And do you believe that Mr. Parrado was retaliating
>        against you for any reason?
>
> A.    Because of Mr. Dawson, absolutely. Because I said
>        about what happened with Mr. Dawson.

(See Doc. 43-4, Pl. Dep. 120:17-25)

35

In context, Russin was testifying about Parrado telling the plaintiff to get a COVID-19 vaccination and describing how Parrado would not provide the plaintiff with a motorized cart to carry boxes. (Id. 118:5-120:16). Thus, even reading his deposition in a light most favorable to the plaintiff's position, Russin did not testify that he reported sexual harassment to Parrado.

Additionally, Russin cites to Walmart's post-termination investigation report for the proposition that Cookson, his first-level manager, was aware of his sexual harassment complaints. (Doc. 43, Pl. Br. in Opp. at 24; Doc. 43-2, Pl. Counterstatement of Material Facts ¶ 39). Walmart's report attributes the following statement to the plaintiff: "Russin said when Parrado and Cookson spoke with Russin about the Covid-19 vaccination, he told Cookson he did not know why management targeted him, and Cookson said the General Manager (Dawson) thinks you're (Russin) cute." (Doc. 43-17, S. Schmidt Investigative Report, ECF p. 16). Cookson denied making that comment during Walmart's investigation. (Id.)

Although Russin and Cookson took contrary positions during the investigation, Russin's ostensible statements to the Walmart investigator about Cookson conflict with his deposition testimony. In Russin's deposition, he testified that a different manager made the comment about Dawson thinking the plaintiff was "cute," that is, the supervisor he referenced throughout his testimony

that did not want to be involved.  (Doc. 43-4, Pl. Dep. 180:1–181:21).  In his

opposition papers, Russin identifies this individual as Carl McGinley, not

Cookson. (Doc. 43-2, Pl. Counterstatement of Material Facts ¶ 40 & n. 16 (citing

Doc. 43-4, Pl. Dep 180:4-21)).

All of these conflicts ultimately do not create a genuine issue of material

fact on causation.  Per the summary judgment record, McGinley played no role in

the plaintiff's formal discipline in May 2021 or in terminating the plaintiff in

October 2021.  And even if the court credited Russin's statement to the Walmart

investigator and not his deposition testimony, Cookson's alleged statement to

Russin does not demonstrate that Cookson was aware of the plaintiff's protected

activity in reporting sexual harassment.  For summary judgment purposes, the

court must reject the nonmoving party's bare assertions, conclusory allegations,

suspicions, and vague statements. See Nitkin v. Main Line Health, 67 F.4th 565,

571 (3d Cir. 2023)(citations omitted).  Since the causation aspect of Russin's

retaliation case rests on these grounds, summary judgment will be granted in

favor of Walmart on those claims.

**Conclusion**

For the reasons stated above, Walmart's motion for summary judgment

(Doc. 38) will be granted in part and denied in part.  Summary judgment will be

granted in favor of Walmart on the plaintiff's Title VII/PHRA claims for sexual

harassment, hostile work environment, and retaliation in Counts II and IV of the amended complaint.   Summary judgment will also be granted in favor of Walmart on the plaintiff's ADA/PHRA hostile work environment and retaliation claims in Counts I and III.  The motion for summary judgment will otherwise be denied as to Russin's ADA/PHRA claims for disability discrimination. Additionally, Walmart's motion to strike Russin's counterstatement of material facts (Doc. 48) will be denied.  An appropriate order follows.


Date: 2/25/25

                                        _____
                                        **JUDGE JULIA K. MUNLEY**
                                        **United States District Court**